UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MATT JAYNE, TRAVIS BEAL and GIOVANNI VACCARELLA, Individually and On Behalf of All Others Similarly Situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**CORE CONSTRUCTION SERVICES, LLC**<br><br>**Defendant.** | **CIVIL ACTION NO.** _____<br><br>**SECTION:** _____<br><br>**MAGISTRATE:** _____ |

**COLLECTIVE ACTION COMPLAINT**

Plaintiffs Matt Jayne, Travis "Jake" Beal, and Giovanni "John" Vaccarella (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, for their Collective Action Complaint against CORE Construction Services, LLC ("Defendant" and/or "CORE"), state as follows:

**GENERAL NATURE OF THE CLAIMS**

1. This case is about Defendant's failure to pay certain classes of employees properly for the overtime hours they worked, in accordance with federal law. Plaintiffs and the similarly situated full-time employees worked for Defendant with the labels of crew leaders and/or superintendents, performing non-management, manual field and construction work on Defendants' behalf in Puerto Rico in the aftermath of Hurricane Irma.

2. Plaintiffs bring their claims for overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") for Defendant's failure to pay them, and those similarly situated, overtime.

3. Plaintiffs and those similarly situated individuals customarily and regularly worked for Defendant in excess of forty (40) hours per week while performing non-management, manual field and construction work on Defendants' behalf in Puerto Rico from approximately April 1, 2018 – November 30, 2018. Defendants knowingly required Plaintiffs and other similarly situated employees to work extensive overtime hours, but failed to pay them at the legally-required overtime rate of pay for all of their overtime hours.

4. Plaintiffs' consent forms to join this action as named plaintiffs are attached hereto as Exhibits A, B, and C respectively. As this case proceeds, it is likely that other individuals will also sign consent forms and join this action as opt-in plaintiffs.

## THE PARTIES

5. Plaintiff Matt Jayne is a resident of Jefferson Parish, Louisiana. From approximately April 2018 – November 2018, Mr. Jayne worked for Defendant performing non-management, manual field and construction work on Defendants' behalf in Puerto Rico. Defendant hired Mr. Payne out of its office in Metairie, Louisiana. During all relevant times, Mr. Jayne was Defendant's employee as defined by the FLSA, 29 U.S.C. § 203(e)(1).

6. Plaintiff Travis "Jake" Beal is a resident of St. Bernard Parish, Louisiana, who was employed by CORE from approximately October 2016 to early 2019. From approximately April 2018 – September 2018, Mr. Jayne worked for Defendant performing non-management, manual field and construction work on Defendants' behalf in Puerto Rico. Defendant hired Mr.

Beal out of its office in Metairie, Louisiana. During all relevant times, Mr. Jayne was Defendant's employee as defined by the FLSA, 29 U.S.C. § 203(e)(1).

7. Plaintiff Giovanni "John" Vaccarella is a resident of El Paso, Texas. From approximately April 2018 – August 2018, Mr. Vaccarella worked for Defendant performing non-management, manual field and construction work on Defendants' behalf in Puerto Rico. Defendant hired Mr. Vaccarella out of its office in Metairie, Louisiana. During all relevant times, Mr. Vaccarella was Defendant's employee as defined by the FLSA, 29 U.S.C. § 203(e)(1).

8. Defendant CORE Construction Services, LLC is a Louisiana Limited Liability Company. CORE's principal office is located at 3131 N. I-10 Service Road East, Suite 401, Metairie, LA 70002. Upon information and belief, CORE provides, in part, pre-construction, construction, program management, and disaster recovery services with a focus on projects for the public sector.

9. At all times relevant to this action, CORE was an "enterprise engaged in interstate commerce" within the meaning of the FLSA. At all relevant times, Defendant CORE employed employees engaged in commerce or in the production of goods for commerce and handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and an annual gross volume of sales and/or services in excess of $500,000.00.

## JURISDICTION AND VENUE

10. This action arises under the FLSA, 29. U.S.C. § 201 *et seq.* and necessarily involves a federal question under the FLSA. 29 U.S.C. §216(b). As such, this Court has subject matter jurisdiction of this case pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§ 1331 and 1337.

11. Venue is proper in the United States District Court, Eastern District of Louisiana, pursuant to 28 U.S.C. § 1391 because (1) Defendant regularly conducts business within this judicial district; (2) Defendant maintains its corporate residence and principal office in this District; and (3) because Plaintiffs worked for Defendant in this District.

### FACTS RELEVANT TO THE PUERTO RICO PROJECT AND DEFENDANT'S FAILURE TO PAY OVERTIME

12. Plaintiffs and those similarly situated allege and incorporate by reference the allegations in the preceding paragraphs.

13. In April of 2018, CORE required Plaintiffs and other similarly situated individuals to relocate to Puerto Rico to provide non-management, manual field and construction labor as part of CORE's participation in the Puerto Rico Sheltering and Temporary Essential Power ("STEP") Program whereby CORE served as a subcontractor to Excel Contractors Inc. ("Excel"), in providing temporary residential construction repairs following Hurricane Irma (the "Puerto Rico Project"). The Federal Emergency Management Agency ("FEMA") authorized the Government of Puerto Rico to access FEMA Public Assistance funding to implement the STEP program. As such, the Puerto Rico Project was federally funded by FEMA.

14. Upon information and belief, under its agreement with Excel, CORE undertook to conduct repairs of approximately 2350 homes devastated by Hurricane Irma in September of 2017. To perform this work, CORE hired workers made up of local tradesmen including electricians, carpenters, plumbers, and other laborers engaged as temporary employees through three local (Puerto Rico) employment agencies (the "Temp Employees"). Upon information and belief, the Temp Employees numbered 250 or more during the course of the Puerto Rico Project. The Temp Employees engaged by CORE on the Puerto Rico Project are not part of this Collection Action.

15. In addition to engaging local TEMP EMPLOYEES on the island and to fulfill its obligations under its contract with Excel, CORE recruited additional full-time employees from CORE's ranks on the mainland and hired additional employees from the mainland to serve as full-time laborers and representatives of CORE in Puerto Rico. As such, CORE required Plaintiffs and other similarly situated individuals hired and employed full-time by to relocate and to provide non-management, manual field, construction, and labor services as part of CORE's efforts. Plaintiffs and those other similarly situated individuals, who were provided the label of crew leader, worked extraordinarily long hours and worked hand in hand in the field with the temporary employees employed in Puerto Rico.

16. By way of example, Mr. Beal began work in Puerto Rico on or about April 23, 2018. Upon arriving in Puerto Rico, Mr. Beal served as a laborer. Soon thereafter, Mr. Beal was given the label of crew leader and maintained the same salary ($65,000/year) that he was paid while working for CORE on the mainland. Upon information and belief, CORE employed approximately fifty-five (55) crews consisting of 4-5 Temp Employees and a CORE crew leader. Upon information and belief, CORE employed approximately 45-55 crew leaders during the Puerto Rico Project.

17. Some crew leaders were eventually given the label of superintendent whereby a superintendent would work with multiple crew leaders to ensure that all work orders were completed in a timely and efficient manner. Mr. Beal was appointed superintendent on or about June 2, 2018 and given a salary of $78,000/year. Upon information and belief, CORE employed 8-10 superintendents during the Puerto Rico Project.

18. Mr. Jayne began work in Puerto Rico on CORE's behalf in April 2018. Upon arriving in Puerto Rico, Mr. Jayne served as a laborer until the Temp Employees were hired by CORE management. Mr. Jayne was eventually given the label of superintendent.

19. Mr. Vaccarella began work in Puerto Rico on CORE's behalf in late April/early May 2018. Upon arriving in Puerto Rico, Mr. Jayne served as a laborer until the Temp Employees were hired by CORE management. Mr. Vaccarella was eventually given the label of crew leader.

20. The work and responsibilities required by CORE of the crew leaders and superintendents were substantially similar in nature. As both a crew leader and a superintendent, Plaintiffs and those similarly situated worked primarily as "blue collar" laborers and worked hand in hand with those Temp Employees providing manual labor on the residential construction sites and in the warehouse. The primary difference between crew leader and superintendent involved the number of work orders and houses that each crew leaders or superintendent worked on and/or was responsible for on any given day. A superintendent was necessarily involved with and responsible for ensuring the timely completion of more work orders and more punch lists on a daily basis than those of a crew leader. However, the day-to-day work required by CORE of the crew leaders and superintendents was substantially similar in nature.

21. A typical work day would have Plaintiffs and those similarly situated individuals arriving at the CORE warehouse in Puerto Rico between 6:00 am – 6:30 am to start their day. On many days, Plaintiffs and those similarly situated individuals arrived at the warehouse prior to 6:00 am. Plaintiffs and those similarly situated individuals would receive their work orders from CORE's onsite management, including but not limited, Logan Spears, Director of Field Operations. Plaintiffs and those similarly situated individuals followed the work order directives

provided to them; they never created, assigned, or altered the work orders provided to them by CORE management.

22. The work orders would identify the houses to be rebuilt or repaired, the scope of work for each house, and/or the punch lists to be manually completed. Plaintiffs and those similarly situated individuals would then drive or ride to each house to begin their manual labor. Plaintiffs and those similarly situated individuals interacted with the Temp Employees assigned to their crews, worked hand in hand with the Temp Employees in fulfilling the work orders and completed the physical labor required to rebuild or repair a particular home or to complete a particular punch list. Crew leaders remained with their crews while performing this particular work. Superintendents, from time to time, would travel back and forth between work sites or the warehouse while performing this work. Plaintiffs and those similarly situated individuals would ensure that the work orders were completed in a timely manner.

23. Plaintiffs and those similarly situated individuals were also required to perform physical labor at the CORE warehouse by loading, unloading, and moving materials, unloading 18-wheeler tractor trailers, and other physical jobs in order to prepare for the next workday. Plaintiffs and those similarly situated individuals were not given a choice or discretion in which warehouse jobs they had to perform. CORE management directed Plaintiffs and those similarly situated individuals "get the job done no matter the costs or time involved."

24. Plaintiffs and those similarly situated individuals were manual, "blue-collar" workers who performed work involving repetitive operations with their hands, physical skill, and energy. Plaintiffs and those similarly situated individuals gained the skills and knowledge required for performance of their routine manual and physical work through on-the-job training,

work experience, and/or apprenticeships, not through the prolonged course of specialized intellectual instruction.

25. Plaintiffs and those similarly situated individuals lacked the authority to hire or fire any other CORE employees, including the Temp Employees hired by CORE on the Puerto Rico Project. CORE never sought, let alone relied upon or gave particular weight to, Plaintiffs' and those similarly situated individuals' suggestions and/or recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other CORE employees. Plaintiffs and those similarly situated individuals did not contract, negotiate wages, or executing agreements with any of the agencies providing the local Temp Employees to CORE on the Puerto Rico Project.

26. The primary duties of the Plaintiffs and those similarly situated individuals did not relate to the management of CORE's enterprise or a customarily recognized department or subdivision of the company. Plaintiffs and those similarly situated individuals performed no work related the management or general business operations of CORE including work in functional areas such as tax; accounting; subcontracting; marketing; research; auditing; insurance; procurement; contracting; hiring; advertising; purchasing; human resources; employee benefits; labor relations; or regulatory or government compliance. Instead, Plaintiffs and those similarly situated individuals were primarily, if not exclusively, involved in the physical building and/or renovating of houses in Puerto Rico and to ensure that the daily work orders assigned to them were completed in a timely manner.

27. Based upon the actual work performed by and the responsibilities assigned to Plaintiffs and those similarly situated individuals, CORE knew or should have known that such employees were non-exempt employees entitled to overtime.

28. While working on the Puerto Rico Project, CORE, through its onsite management, required Plaintiffs and those similarly situated individuals to work far beyond a 40-hour work week.

29. Upon information and belief, CORE's onsite executive and administrative management for the Puerto Rico Project included the following individuals: Mickey Ludlam, Vice President of CORE, Logan Spears, Director of Field Operations, Jenny Dunn, Human Resources/Accounting Department, Darby Hartenstein, Assistant Project Manager/Office Manager, and several other salaried employees to be identified through the discovery of this matter who CORE designated with specific management and oversight of departments including materials, work orders, and budgeting. CORE's onsite executive and administrative leadership and management did not work in the field nor provide manual labor on the Puerto Rico Project as the Plaintiffs and those similarly situated individuals did on a daily basis.

30. CORE's executive and administrative management team onsite in Puerto Rico maintained offices and staff within a warehouse in Puerto Rico throughout the duration of the Puerto Rico project. Plaintiffs and those similarly situated employees worked in the field throughout the island and maintained no offices and had no staff.

31. CORE's executive and administrative management onsite in Puerto Rico required Plaintiffs and those similarly situated individuals to work in the field an average of 14 hours or more per day, seven days a week. Again, a typical work day would have Plaintiffs and those similarly situated individuals arriving at the CORE warehouse between 6:00 am – 6:30 am to start their day (many times, before 6:00 am). Plaintiffs and those similarly situated individuals would often conclude their work day well after 7:30 pm. Upon information and belief, rarely, if ever, did Plaintiffs and those similarly situated individuals work less than 12 hours/day and often

worked as many as 15-18 hours/day. On numerous occasions, Plaintiffs and those similarly situated individuals would take a short break for dinner and then return to work only to arrive home well after midnight.

32. For example, upon information and belief, even when the Temp Employees clocked out, Plaintiffs and those similarly situated individuals were required to continue working, often on short rest. It was not unusual for Plaintiffs and those similarly situated individuals to work until midnight or 1:00 am only to be told to resume work the following day at 6:00 am. These practices were noticed and commented on by various members of CORE's onsite executive and administrative leadership and management throughout the Puerto Rico Project, including, but not limited to, Mickey Ludlam, Vice President of CORE, and Jenny Dunn, Accounting. At one point, Ms. Dunn informed CORE's leadership that "this has to stop."

33. Defendant was aware, or should have been aware, that Plaintiffs and those similarly situated individuals performed work that required them to work overtime. Defendant provided Plaintiffs and those similarly situated crew leaders and superintendents with their work orders, work schedules, and assignments. Plaintiffs and those similarly situated crew leaders and superintendents did not create their own schedules; the workload and responsibilities were dictated to them by CORE's onsite management. In addition, Defendant required Plaintiffs and those similarly situated crew leaders and superintendents to turn in their work orders at the end of each day. Defendant was well aware of the hours work by Plaintiffs and those similarly situated crew leaders.

34. Despite these practices and the comments made by members of CORE's onsite executive and administrative management team, CORE failed to pay Plaintiffs and those

similarly situated individuals overtime pay during the course of the Puerto Rico Project, from at least April 2018 – November 2018.

35. In Mr. Jayne's case, CORE has failed to pay him proper overtime pay for an absolute minimum of approximately 1,350 hours over a period of 30 weeks from approximately April 5, 2018 – November 30, 2018. Upon information and belief, on average, Mr. Jayne worked between 80 – 90 hours per week, sometimes more, during this same time period. As such, Mr. Jayne worked an average of 40-50 hours/week (over a period of approximately 30 weeks) of overtime for which he has not been compensated.

36. The exact number of overtime hours worked by Mr. Jayne between April 5, 2018 and November 30, 2018 will become more discernable through the discovery process, especially because Defendant can now access its own employee records. Those documents remain or should remain in the possession, custody, and/or control of Defendant. Mr. Jayne's workload was tied, in part, to the hours clocked in and logged by Temp Employees associated with crews and work orders with whom Mr. Jayne worked.

37. In Mr. Beal's case, CORE has failed to pay him proper overtime pay for an absolute minimum of approximately 800 hours over a period of 17 weeks from approximately April 23, 2018 – August 29, 2018. Upon information and belief, on average, Mr. Beal worked between 80 – 90 hours per week, sometimes more, during this same time period except for one week of vacation. As such, Mr. Beal worked an average of 40-50 hours/week (over a period of approximately 17 weeks) of overtime for which he has not been compensated

38. The exact number of overtime hours worked by Mr. Beal between April 23, 2018 and August 29, 2018 will become more discernable through the discovery process, especially because Defendant can now access its own employee records. Those documents remain or

should remain in the possession, custody, and/or control of Defendant. Mr. Beal's workload was tied, in part, to the hours clocked in and logged by Temp Employees associated with crews and work orders with whom Mr. Beal worked.

39. In Mr. Vaccarella's case, CORE has failed to pay him proper overtime pay for an absolute minimum of approximately 750 hours over a period of 16 weeks from approximately May 1, 2018 – August 29, 2018. Upon information and belief, on average, Mr. Vaccarella likewise worked between 80 – 90 hours per week, sometimes more, during this same time period. As such, Mr. Vaccarella worked an average of 40-50 hours/week (over a period of approximately 16 weeks) of overtime for which he has not been compensated.

40. The exact number of overtime hours worked by Mr. Vaccarella between May 1, 2018 and August 29, 2018 will become more discernable through the discovery process, especially because Defendant can now access its own employee records. Those documents remain or should remain in the possession, custody, and/or control of Defendant. Mr. Vaccarella's workload was tied, in part, to the hours clocked in and logged by Temp Employees associated with crews and work orders with whom Mr. Vaccarella worked.

41. Discovery will further confirm the exact hours worked by those crew leaders and superintendents similarly situated to Plaintiffs who worked on the Puerto Rico Project on behalf of CORE between April 2018 and November 2018. Those documents remain or should remain in the possession, custody, and/or control of Defendant. The workload of those similarly situated employees was tied, in part, to the hours clocked in and logged by Temp Employees associated with crews and work orders with whom those similarly situated employees worked.

42. Even though Defendant required Plaintiffs and those similarly situated individuals to work overtime hours, Defendant failed to pay them property for all of the hours they worked

over forty (40) hours per week. The FLSA, 29 U.S.C. § 207, requires employers to pay all non-exempt employees one and one-half their regular rate of pay for all hours worked over the forty (40) hours per workweek.

43. These practices violate the provisions of the FLSA, 29 U.S.C. § 201 *et seq*., and, as a result of these unlawful practices, Plaintiffs and those similarly situated have suffered a loss of wages.

44. In addition, Defendant's conduct was a willful violation of the FLSA, within the meaning of 29 U.S.C. § 255(a).

## COLLECTIVE ACTION ALLEGATIONS

45. Plaintiffs and those similarly situated allege and incorporate by reference the allegations in the preceding paragraphs.

46. The claims in this Complaint arising out of the FLSA are brought by Plaintiffs on behalf of themselves and similarly situation individuals who worked for Defendant with the employment labels of crew leaders and/or superintendent on the Puerto Rico Project from approximately April 2018 – November 2018.

47. Plaintiffs seek to have certified a collective action consisting of the following:

All persons who (1) filed a written consent form to join this lawsuit; (2) were employed by Defendant with an employment label of crew leader or superintendent (or other similar positions) to work on the Puerto Rico Project during the three-year statute of limitations; (3) worked more than forty (40) hours in a week during the applicable statutory period; and (4) failed to receive overtime pay for hours worked above and beyond a forty (40) hour workweek.

48. The FLSA Collective all performed similar work, which included the performance of non-management, manual field and construction work on the Puerto Rico Project as either a crew leader or a superintendent (or both), as "blue collar" laborers who worked hand in hand with those Temp Employees providing manual labor on the residential construction sites

and in the warehouse. The FLSA Collective worked on a discrete project (the Puerto Rioc Project) for a particular period of time (April 2018 – November 2018) while performing similar tasks. The FLSA Collective is also similar because they were not paid the required overtime premium of one-and-one-half times their regular rate of pay for any hours worked over forty (40) hours per week while on the Puerto Rico Project.

49. The entire FLSA Collective is estimated to consist of approximately 40-45 crew leaders and 8-10 superintendents for an estimated total of 48-55 similarly-situated employees.

50. To the extent necessary, this Honorable Court may group members within the FLSA Collective to create a subclass of crew leaders and a subclass of superintendents on the Puerto Rico Project once all opt-ins have appeared and after a reasonable time for discovery.

51. Plaintiffs have consented in writing to be part of this action as named plaintiffs pursuant to 29 U.S.C. § 216(b). As this case proceeds, it likely that other individuals will sign consent forms and join as opt-in plaintiffs.

52. Plaintiffs and the FSLA Collective are victims of Defendants' repeated, systematic, and consistent illegal wage policies that have resulted in violations of their rights under the FLSA, 29 U.S.C. § 201 *et seq*. and have caused significant damage to them.

53. Defendant is aware that Plaintiffs and those similarly situated worked under these conditions, and yet Defendant still denied them the legally-required overtime compensation.

54. Defendant's conduct constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255.

55. Defendant is liable under the FLSA for failing to property compensate Plaintiffs and those similarly situated.

56.     Notice of this action should be sent to the FLSA Collective. There are numerous similarly situated current and former employees of Defendant who have been denied appropriate compensation in violation of the FLSA who would benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity to join. Those similarly situated employees are known to Defendants and are readily identifiable through Defendant's records. These similarly situated employees should be notified of and allowed to opt into this action, pursuant to 29 U.S.C. § 216(b)

### COUNT 1 – VIOLATION OF THE FLSA – FAILURE TO PAY OVERTIME

57.     Plaintiffs and those similarly situated allege and incorporate by reference the allegations in the preceding paragraphs. Specifically, Plaintiffs and those similarly situated repeat and reallege paragraphs 1 through 56 as if fully set forth herein.

58.     Defendants are required to pay Plaintiffs and the FLSA Collective one and one-half (1ó) times their regular rate for all hours worked in excess of forty hours in a workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207,*et seq*.

59.     Defendants have failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

60.     Defendants have willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiffs and the FLSA Collective their full overtime wages.

61.     Due to Defendant's willful violations of the FLSA, Plaintiffs and the FLSA Collective are entitled to recover their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the FLSA Collective, respectfully

pray for the following:

 A. That this action may be maintained as a FLSA collective action;

 B. That this Honorable Court enter judgment authorizing the issuance of notice at the earliest possible time to all current or former employees of CORE who worked on the Puerto Rico Project on CORE's behalf with an employment label of crew leader or superintendent (or other similar position). This notice should inform them that this action has been filed, describe the nature of the action, and explain their right to opt into this lawsuit;

 C. Judgment in favor of Plaintiffs and the FSLA Collective that Defendant violated the overtime provisions of the FLSA and are liable to Plaintiffs and those similarly situated;

 D. Judgment declaring that Defendant's violations of the FLSA were willful;

 E. Judgment in favor of Plaintiffs and the FSLA Collective and against Defendant for an amount equal to the Plaintiffs' and those similarly situated individuals' unpaid back wages at the applicable overtime rate;

 F. Judgment in favor of Plaintiffs and the FSLA Collective and against Defendant for an amount equal to the unpaid back wages owed by Defendant as liquidated damages as authorized by the FLSA;

 G. An award in favor of Plaintiffs and the FSLA Collective and against Defendant of pre- and post-judgment interest;

 H. An award in favor of Plaintiffs and the FSLA Collective and against Defendant of costs and reasonable attorneys' fees;

 I. Leave to add additional plaintiffs by the filing of written consent forms, or any

other method approved by the Court

J. Such further relief as the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated:  July 6, 2020

Respectfully submitted:

*/s/ Stacey L. Meyaski*
K. Todd Wallace, T.A. (Bar #25920)
todd.wallace@walmey.com
Stacey LaGraize Meyaski (Bar #27543)
stacey.meyaski@walmey.com
WALLACE MEYASKI, LLC
5190 Canal Blvd., Suite 102
New Orleans, LA  70124
Telephone:  (504) 644-2011
Facsimile:   (504) 644-2010

ATTORNEYS FOR PLAINTIFFS
MATT JAYNE, TRAVIS "JAKE" BEAL,
AND GIOVANNI "JOHN"
VACCARELLA AND THE PUTATIVE
COLLECTIVE OF SIMILARLY
SITUATED PLAINTIFFS